UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD GOMEZ, | No. 2:21-cv-1592 KJM DB P |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| LADAN, | |
| Defendant. | |

Plaintiff is a state prisoner proceeding pro se with a civil rights action under 42 U.S.C. §1983. Plaintiff alleges defendant was deliberately indifferent to his serious medical needs. Before the court is defendant's motion for summary judgment. For the reasons set forth below, this court recommends defendant's motion be granted.

**BACKGROUND**

This case is proceeding on plaintiff's complaint filed September 3, 2021. (ECF No. 1.) Plaintiff alleges the following. He is an incomplete quadriplegic who uses a suprapubic catheter to urinate. A suprapubic catheter is a device that is inserted into the bladder through a small abdominal incision. It is used to drain urine from the bladders of patients who cannot urinate. One risk of having a suprapubic catheter is autonomic dysreflexia, a condition which may be caused by a blocked urinary catheter and is considered an emergency. High blood pressure is a sign of autonomic dysreflexia.

1

Twice during the night of January 26/27, 2018, plaintiff experienced pain and very high blood pressure indicating he was experiencing autonomic dysreflexia. Defendant Ladan, a registered nurse, failed to treat plaintiff's condition seriously and delayed flushing and then replacing his catheter. As a result, plaintiff experienced unnecessary pain and distress.

On June 2, 2022, defendant answered the complaint. (ECF No. 22.) On April 20, 2023, defendant filed the present motion for summary judgment. (ECF No. 31.) Plaintiff filed an opposition (ECF No. 39) and defendant filed a reply (ECF No. 40).

## MOTION FOR SUMMARY JUDGMENT

**I. Summary Judgment Standards under Rule 56**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a

circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party typically may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. However, a complaint that is submitted in substantial compliance with the form prescribed in 28 U.S.C. § 1746 is a "verified complaint" and may serve as an opposing affidavit under Rule 56 as long as its allegations arise from personal knowledge and contain specific facts admissible into evidence. See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995) (accepting the verified complaint as an opposing affidavit because the plaintiff "demonstrated his personal knowledge by citing two specific instances where correctional staff members . . . made statements from which a jury could reasonably infer a retaliatory motive"); McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987); see also El Bey v. Roop, 530 F.3d 407, 414 (6th Cir. 2008) (Court reversed the district court's grant of summary judgment because it "fail[ed] to account for the fact that El Bey signed his complaint under penalty of perjury pursuant to 28 U.S.C. § 1746. His verified complaint therefore carries the same weight as would an affidavit for the purposes of summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

To show the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

1  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).
2  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in
3  order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations
4  omitted).
5       "In evaluating the evidence to determine whether there is a genuine issue of fact," the
6  court draws "all reasonable inferences supported by the evidence in favor of the non-moving
7  party." Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011).  It is the
8  opposing party's obligation to produce a factual predicate from which the inference may be
9  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),
10 aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing
11 party "must do more than simply show that there is some metaphysical doubt as to the material
12 facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the
13 nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation
14 omitted).

15 **II.  Analysis**

16      Defendant contends the undisputed facts show she provided plaintiff with reasonable and
17 timely medical care.  Based on these facts, plaintiff cannot prove that defendant was deliberately
18 indifferent to his serious medical needs.  Plaintiff disputes some of the facts and claims defendant
19 failed to treat his condition with sufficient seriousness and the delay in providing him treatment
20 caused him to experience pain and distress.

21      **A.  Legal Standards for Eighth Amendment Medical Claim**

22      The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S.
23 Const. amend. VIII.  The unnecessary and wanton infliction of pain constitutes cruel and unusual
24 punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986);
25 Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).
26 Neither accident nor negligence constitutes cruel and unusual punishment, as "[i]t is obduracy
27 and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited
28 by the Cruel and Unusual Punishments Clause." Whitley, 475 U.S. at 319.

What is needed to show unnecessary and wanton infliction of pain "varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (citing Whitley, 475 U.S. at 320). In order to prevail on a claim of cruel and unusual punishment, however, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur. Wilson, 501 U.S. at 298-99.

For an Eighth Amendment claim arising in the context of medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106. An Eighth Amendment medical claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104). Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities." Id. at 1059-60. By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference. See Farmer, 511 U.S. at 834. In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care. Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988).

Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter

1    Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06); see also
2    Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in
3    diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth
4    Amendment rights."); McGuckin, 974 F.2d at 1059 (same). Deliberate indifference is "a state of
5    mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for
6    the prisoner's interests or safety.'" Farmer, 511 U.S. at 835.

7         Delays in providing medical care may manifest deliberate indifference. Estelle, 429 U.S.
8    at 104-05. To establish a claim of deliberate indifference arising from delay in providing care, a
9    plaintiff must show that the delay was harmful. See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th
10   Cir. 2002); Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059;
11   Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198,
12   200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.
13   1985). In this regard, "[a] prisoner need not show his harm was substantial; however, such would
14   provide additional support for the inmate's claim that the defendant was deliberately indifferent to
15   his needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

16        Finally, mere differences of opinion between a prisoner and prison medical staff or
17   between medical professionals as to the proper course of treatment for a medical condition do not
18   give rise to a § 1983 claim. See Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330,
19   332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662
20   F.2d 1337, 1344 (9th Cir. 1981).

21        **B. Material Facts**

22        Defendant filed a statement of undisputed facts as required by Local Rule 260(a).
23   (Defendant's Stmt. of Undisputed Facts ("DSUF") ECF No. 31-2.) Local Rule 260(b) requires a
24   party opposing a motion for summary judgment to specifically address each fact alleged to be
25   undisputed and, for those facts the party disputes, provide a citation to "any pleading, affidavit,
26   deposition, interrogatory answer, admission, or other document relied upon in support of that
27   denial." E.D. Cal. R. 260(b). Plaintiff failed to comply with Local Rule 260(b).
28   ////

In light of plaintiff's pro se status, this court has reviewed both parties' filings and statements plaintiff made in his verified complaint and at his deposition[1] of which he has personal knowledge. This court finds the following facts are material to plaintiff's Eighth Amendment claim and are undisputed. The disputed material facts are addressed in the "Discussion" section below.

1. At all relevant times, plaintiff was a prisoner incarcerated at the California Health Care Facility ("CHCF"). (DSUF ##1, 2.)

2. Defendant A. Ladan is a registered nurse, who worked at CHCF at all times relevant to this lawsuit. (DSUF #3.)

3. A suprapubic catheter is a device that is inserted into the bladder through a small abdominal incision. It is used to drain urine from the bladders of patients who cannot urinate, such as quadriplegic or quadriparetic individuals. (DSUF #4.)

4. A suprapubic catheter allows the urine to drain from the bladder through the catheter. The urine is collected outside the body, often in a bag. (DSUF #6.)

5. If a catheter becomes blocked, the flow of urine may be impeded or stopped. (DSUF #7.)

6. If a catheter becomes blocked, it may be flushed or changed. (DSUF ##8, 9.)

7. Changing a catheter poses a risk of infection. (DSUF #10.)

8. Autonomic dysreflexia is a condition that can occur in patients with certain spinal injuries. This condition occurs in response to a painful, uncomfortable or irritating stimulus in the paralyzed portion of the body. The body is not able to signal the brain through the sensory nervous system, because of the spinal cord damage. When the body cannot use the sensory nervous system to send that message to the brain, the autonomic nervous system reacts to the stimulation by constricting blood vessels above the injury, resulting in increased blood pressure. The nervous system responds by trying to lower the blood pressure, but those messages from the nervous system cannot travel below the point

---

[1] A paper copy of the transcript of plaintiff's deposition was lodged with the court on April 20, 2023. (See ECF No. 32.)

7

of injury in the spinal cord, so the blood pressure continues to rise.  A common cause of autonomic dysreflexia is a distended bladder, which may be due to a blocked urinary catheter.  Elevated blood pressure is a symptom of autonomic dysreflexia.  (DSUF #11.)

9.  Plaintiff has been an incomplete quadriplegic since 1983.  (DSUF #12.)

10.  Plaintiff has been using a suprapubic catheter since approximately 2006.  The bag attached to plaintiff's catheter to collect urine is referred to as a "foley bag."  (DSUF #13.)

11.  Medical records provided by defendant show that autonomic dysreflexia appears to be one of plaintiff's diagnoses.  Several of the submitted medical records labeled "Progress Notes" list autonomic dysreflexia under the category "Assessment/Plan."  Most of Progress Notes from January 2018 include a notation beneath the condition "Autonomic Dysreflexia" that indicates it was not then considered an active problem:  "Stable, no recent symptoms;" "Stable, recently asymptomatic, continue to monitor;" "Stable, no recent exacerbation, continue to monitor." (ECF No. 31-4 at 29-35.)

12.  Plaintiff had experienced autonomic dysreflexia prior to January 2018.  (Pl.'s Depo. at 44.)

13.  In January 2018, plaintiff's assigned primary care physician was Dr. E. Nguyen.  (DSUF #14.)

14. On January 11, 2018, plaintiff met with Dr. Nguyen who recorded in a progress note that he had discussed extensively with plaintiff that frequent irrigation of his catheter, when not obstructed, may pose a higher risk of infection.  (DSUF #15.)

15. As of January 25, 2018, plaintiff's routine catheter care included weekly flushing on Thursdays and daily as needed using normal saline.  (DSUF #16.)

16.  As of January 2018, plaintiff's routine catheter care also included changing his suprapubic catheter once a month or as needed.  (DSUF #17.)

17.  Plaintiff's suprapubic catheter was changed on January 4, 2018.  (DSUF #18.)

////

18. Plaintiff's suprapubic catheter was flushed on Thursday, January 25, 2018. (DSUF #19; Progress Note, ECF No. 31-4 at 35.)

19. Plaintiff's foley bag was drained at 8:00 p.m. on January 26, 2018. (Pl.'s Depo. at 63.)

20. Defendant worked as a nurse in plaintiff's facility at CHCF during first watch shift (10:00 p.m. to 6:00 a.m.) on January 26 to January 27, 2018. (DSUF #21.)

21. Defendant regularly works with patients who have suprapubic catheters. (DSUF #22.)

22. Defendant has been trained to recognize symptoms of autonomic dysreflexia. (DSUF #23.)

23. Late on the night of January 26, 2018, plaintiff reported to defendant that he believed his catheter was clogged and his blood pressure was rising. Defendant's notes reflect that plaintiff was very anxious. (DSUF #24; ECF No. 31-6 at 2.)

24. After plaintiff told defendant he believed his catheter was clogged, defendant noted that plaintiff's blood pressure was taken and was 166/105, which was elevated. (DSUF #25.)

25. Defendant then checked plaintiff's foley bag. She recorded that it had 1200 cubic centimeters of yellow urine. (DSUF #26.)

26. Plaintiff insisted that defendant flush his catheter. Instead, defendant emptied the foley bag and rechecked plaintiff's blood pressure. At that time plaintiff's blood pressure was 124/72, within a normal range. (DSUF #31.)

27. Defendant flushed plaintiff's suprapubic catheter with normal saline. Flushing the catheter drained 350cc of urine. (DSUF #33; Progress Note dated Jan. 27, 2018, ECF No. 31-6 at 2.)

28. Defendant was able to flush the catheter without resistance. (DSUF #34.)

29. After defendant flushed his catheter, plaintiff said he felt better and drank about a pitcher of water. (DSUF #35.)

////

    30. Defendant rechecked plaintiff at 12:39 a.m. and he informed her that he was fine. (DSUF #36.)

    31. Defendant provided Plaintiff with additional care on January 27, 2018, at approximately 1:00 a.m. (DSUF #40.)

    32. Plaintiff reported feeling sweaty and cold at approximately 1:00 a.m. on January 27, 2018. (DSUF #41.)

    33. Defendant noted that plaintiff was very anxious at that time. (DSUF #42.)

    34. Shortly after defendant arrived at plaintiff's cell, his blood pressure was recorded at 174/113, which is high. Once plaintiff learned that his blood pressure was high, he became more anxious and told defendant he wanted to go to SEMS (Standby Emergency Medical Services), or emergency. (DSUF #43.)

    35. After taking plaintiff's blood pressure, defendant checked plaintiff's foley bag and observed urine draining into the foley bag. (DSUF ##44, 45.)

    36. Defendant told plaintiff she needed to check to see if he had a physician's note about how to address high blood pressure. (DSUF #46.)

    37. On January 27, 2018, at 1:40 a.m., defendant offered plaintiff Clonidine, per physician's order, for increased blood pressure. (DSUF #48.)

    38. Plaintiff refused the medication at first but after a few minutes took half of it. (DSUF #49.)

    39. Plaintiff was very anxious and restless, telling defendant that he wanted to have his suprapubic catheter changed. (DSUF #50.)

    40. Defendant changed plaintiff's suprapubic catheter at approximately 2:00 a.m. on January 27, 2018. In her notes, defendant stated that she had "drained 450 cc of light reddish urine, noted with scant bleeding when changed the catheter." (DSUF #51; Progress Note dated Jan. 27, 2018, ECF No. 31-6 at 2.)

    41. After plaintiff complained of generalized pain, defendant gave him 600 milligrams of Ibuprofen at around 2:07 a.m. (DSUF #54.)

////

1   42. Plaintiff was then much calmer and told defendant he was going to sleep.
2   (DSUF ##55, 56.)
3   43. Plaintiff's blood pressure was taken at 5:36 a.m. on January 27 and was
4   108/68. (Ex. B to Def.'s Decl., ECF No. 31-6 at 4.)
5   44. High blood pressure can be triggered by anxiety. (DSUF #62.)
6   45. High blood pressure does not appear as a diagnosis in plaintiff's medical
7   records from January 2018 that were submitted by defendant. (ECF No. 31-4 at 29-35.)

**C. Discussion**

For purposes of this analysis, this court will assume, without finding, that plaintiff's medical condition at the relevant times amounted to a serious medical need under the Eighth Amendment. The question, then, is whether defendant responded to that need with deliberate indifference.

Plaintiff complains of two interactions with defendant.[2] The first was late at night on January 26 and the second at about 1:00 a.m. on January 27. With respect to the first interaction, the parties provide different timelines. Those differences are material to plaintiff's claim. Plaintiff contends he rang for medical help at 10:35 p.m. Sometime after that, defendant arrived at his cell. At 11:15 p.m., defendant flushed plaintiff's catheter. Therefore, the delay plaintiff complains of was no more than 40 minutes.

Defendant states that she arrived at plaintiff's cell at 11:40 p.m. His blood pressure was taken. She then drained his foley bag and thirty minutes later took his blood pressure again, which had dropped to a normal level. After that, at about midnight, she flushed plaintiff's catheter. Defendant's timeline is obviously in error. If she arrived at 11:40 and flushed plaintiff's catheter at 12:00, then plaintiff waited only 20 minutes before his catheter was flushed. That conflicts with defendant's statement, as reflected in her notes, that she waited 30 minutes to re-check plaintiff's blood pressure after she drained the foley bag and before she flushed the

---

[2] Unless otherwise noted, the facts discussed here that are alleged by plaintiff are those contained in his verified complaint (ECF No. 1). The facts attributed to defendant are those contained in her declaration and the exhibits attached thereto. (ECF Nos. 31-5 and 31-6.)

1 catheter.  Because defendant's timeline does not hold up to scrutiny, for purposes of this motion
2 this court will accept plaintiff's timeline and assume that the time between defendant's arrival at
3 plaintiff's cell and defendant flushing the catheter could have been as long as 40 minutes.

4 Even assuming 40 minutes elapsed between defendant's arrival at plaintiff's cell and
5 flushing the catheter, this court finds plaintiff fails to show defendant acted with deliberate
6 indifference.  The undisputed facts show that plaintiff summoned medical help because he was
7 concerned his catheter was blocked and he was experiencing pain and rising blood pressure.
8 While plaintiff testified in his deposition that defendant delayed responding to his call for help, he
9 did not recall how long he waited before defendant came to his cell.  (Pl.'s Depo. at 51.[3])
10 Therefore, this court does not consider any delay by defendant in arriving at plaintiff's cell.  In
11 any event, as set out above, this court will assume for purposes of this analysis that plaintiff could
12 have waited up to 40 minutes before defendant flushed his catheter.

13 When defendant arrived at plaintiff's cell, plaintiff's blood pressure was taken.  It was
14 166/105, which the parties do not dispute is elevated.  Defendant then drained plaintiff's foley
15 bag, which showed a collection of urine.  Sometime after draining the bag, defendant took
16 plaintiff's blood pressure again and it had dropped to 124/72, a normal blood pressure.[4]
17 Defendant states that she was reluctant to flush or change the catheter due to the risk of infection.
18 In his brief, plaintiff recognizes that infection was defendant's primary concern.  (ECF No. 39 at
19 7.)  Despite the lack at that point of a medical indication plaintiff was suffering the consequences
20 of a blocked catheter, defendant did flush the catheter.  There was no resistance to flushing,
21 ////

---

[3] In his brief, plaintiff states that it took defendant twenty minutes to come to his cell.  Because plaintiff's brief is not verified, this court cannot consider that statement as competent evidence and looks to plaintiff's verified complaint and sworn deposition testimony in which plaintiff stated he did not recall how much time passed before defendant showed up.

[4] Defendant indicates she took the blood pressure a second time before she drained the foley bag. Her notes reflect that the events occurred in that order.  Plaintiff does not directly challenge that order of events, but his brief makes clear that he is assuming the second blood pressure was taken after defendant flushed his catheter.  While the second blood pressure reading is relevant, even if it was taken after defendant flushed the catheter this court's determination that defendant was not deliberately indifferent during her first interaction with plaintiff would remain the same.

indicating plaintiff's catheter was not blocked. Plaintiff then told defendant he felt better and drank some water.

The only question is whether defendant's delay in flushing the catheter was deliberately indifferent to plaintiff's pain and distress. Defendant provides a declaration of Dr. Feinberg, Chief Medical Consultant for the CCHCS Office of Legal Affairs. Dr. Feinberg described the events involving the parties first interaction as follows:

> According to the record, 350 cc of urine was flushed from his catheter with no resistance. This is also significant because a lack of resistance in a flushed catheter is a sign the catheter is not blocked. Afterwards, Plaintiff stated he felt better. In my training and experience, if a patient complained of concerns of a clogged catheter, it would be appropriate to flush the catheter first to see if a flushing resolved the reported problems, due to the risk of infection posed by changing a catheter. This particular nurse flushed Plaintiffs catheter, despite the presence of urine in the bag suggesting the catheter had been working correctly.

(Decl. of Dr. B. Feinberg, ECF No. 31-7 at 6.) Dr. Feinberg opined that defendant "responded appropriately" to plaintiff's concerns. (Id.) Plaintiff provides no evidence to support his argument that the relatively brief time period between plaintiff's call for medical help and the time she flushed the catheter demonstrates deliberate indifference. During that time, plaintiff's blood pressure was taken, his foley bag was drained, and his blood pressure was taken a second time. Defendant was actively providing plaintiff care and returned at 12:39 that evening to check on plaintiff's condition.

Plaintiff also points out that 350cc of urine was drained when the catheter was flushed. He argues that this shows the catheter was blocked because the catheter is "free-flowing" so no urine should be backed up in the bladder. (See ECF No. 39 at 9; Pl. Depo at 31.) However, plaintiff points to no competent evidence establishing that a certain amount of urine in his bladder showed that the catheter was not draining properly. Further, defendant recorded that the catheter was flushed without resistance, indicating it was not blocked.

Plaintiff concedes that defendant's concern about the risk of infection to plaintiff was at least one reason she did not want to change or flush his catheter unnecessarily. Plaintiff is not a medical expert. He provides only his personal opinion that defendant should have immediately

13

flushed or changed his catheter. Plaintiff fails to show that he can succeed on his claim that defendant was deliberately indifferent to his serious medical need during her first interaction with him on the night of January 26/27, 2018.

With respect to defendant's second interaction with plaintiff, the parties dispute one material fact – plaintiff's blood pressure when defendant saw him at around 1:00 a.m. on January 27. Plaintiff contends that it was taken twice. The first reading was 238/113. Plaintiff alleges the second reading was taken about five minutes later. (ECF No. 1 at 3; Pl.'s Depo. at 82.) Plaintiff states that defendant only wrote down the second reading because, she told him, she was supposed to record the lowest one. (Pl.'s Depo. at 83.) Plaintiff later testified that he recalled the second blood pressure reading was 174/113. (Id. at 86.)

Plaintiff states that he made sure everyone in his cell saw the first blood pressure reading. However, plaintiff presents no evidence to corroborate his contention that his blood pressure was that high. Plaintiff further alleges that defendant did not change his catheter until after a correctional officer who was present told her she needed to do something because plaintiff's blood pressure was so high. Plaintiff did not hear the conversation, but the correctional officer told plaintiff he would talk to defendant about changing the catheter and she came back to his cell and did so. Again, plaintiff has no evidence to support the contention that defendant changed the catheter only because the correctional officer spoke with her. (ECF No. 1 at 3-4.) And, in any event, the fact that a correctional officer, who plaintiff does not allege had any medical training, recommended a course of action does not demonstrate either that the course of action was medically necessary or that defendant did not change the catheter to, as she states, alleviate plaintiff's stress rather than because she felt it was medically necessary.

Defendant contends that plaintiff's blood pressure was 174/113 at 1:00 a.m. on January 27. Defendant provides a copy of the notes she wrote shortly after her interactions with plaintiff. Those notes reflect that plaintiff's blood pressure was 174/113 at 1:00 a.m. (Ex. A to Def.'s Decl., ECF No. 31-6 at 2.)

It is not disputed that during their second interaction, defendant recognized that plaintiff's blood pressure was high, checked plaintiff's records to determine whether there were doctors'

orders regarding high blood pressure, obtained a high blood pressure medication and provided it to plaintiff at 1:40 a.m.  Plaintiff initially refused the medication and then took half of the dose.  It is also not disputed that plaintiff was extremely distressed and asked repeatedly to be taken to the emergency unit, that he was sweating and shaking.  Plaintiff states that he was in pain, which defendant does not dispute.  Nor is it disputed that at 2:00 a.m. defendant changed plaintiff's catheter.

Defendant recorded that 450cc of urine drained after the catheter was changed.  Plaintiff argues again that there should not have been much, if any, urine drained from his bladder because the catheter should be free-flowing.  According to plaintiff, and again without any competent medical evidence to support his contention, the amount of drained urine shows his catheter was blocked.

There is no question that plaintiff was extremely distressed about experiencing autonomic dysreflexia.  It is not disputed that the condition is reflected in plaintiff's medical records from January 2018.  It is also not disputed that plaintiff had experienced autonomic dysreflexia in the past but in January 2018 had not had any recent incidents.

Plaintiff fails to show defendant acted with deliberate indifference when she did not immediately change his catheter.  Regardless of plaintiff's precise blood pressure reading at 1:00 a.m., the parties agree that it was measured at 174/113 shortly after defendant arrived in plaintiff's cell.  Defendant knew it was high and, after checking plaintiff's medical records, provided plaintiff with a blood pressure medication.  While it took about 40 minutes to provide that medication, plaintiff does not complain about that delay and, indeed, cannot do so since he refused the full dose of the medication when it was provided.

Defendant had reasons not to immediately change plaintiff's catheter.  Defendant had emptied plaintiff's foley bag and flushed plaintiff's catheter less than two hours previously.  Further, defendant saw urine in plaintiff's foley bag that had accumulated in the short period of time before she arrived at plaintiff's cell at 1:00 a.m.  Based on those facts, and the opinion of Dr. Feinberg that defendant acted appropriately, this court finds plaintiff could not convince a jury

////

that defendant acted with such disregard for his health that it amounted to deliberate indifference to his medical needs.

It is worth noting that there is no evidence plaintiff has medical training.[5] The only "medical" evidence he presents is a copy of what appears to be a publication produced by the Consortium for Spinal Cord Medicine. (ECF No. 39-1 at 5.) Assuming the publication is competent evidence about diagnosis and treatment of autonomic dysreflexia, it supports what defendant did. According to the publication, the major risk of autonomic dysreflexia is high blood pressure, which can cause "a stroke and death." The publication then states that there are "two ways" to reduce the blood pressure: "1. Fix whatever is causing the problem ¶ 2. Special blood pressure medications prescribed by your health-care professional." (Id. at 8.) The fact that defendant initially took the second course, does not demonstrate she acted with deliberate indifference.

While this court understands plaintiff was concerned that he was suffering autonomic dysreflexia, defendant acted to address plaintiff's symptoms. A difference of opinion about medical care does not amount to deliberate indifference. Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1058 (9th Cir. 2004).

Based on the undisputed evidence and looking at the material disputed evidence in plaintiff's favor, this court finds plaintiff cannot succeed on his Eighth Amendment claims and judgment should be entered in defendant's favor.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that defendant's motion for summary judgment (ECF No. 31) be granted.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, either party may file written

---

[5] Plaintiff stated at his deposition that he "was educated at Santa Clara Medical Center" in the spinal cord ward about autonomic dysreflexia in 1983. (Pl.'s Depo. at 37, 39.) That fact does not show that plaintiff was a medical expert on the subject at that time or 35 years later during the events at issue here.

objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 1, 2024

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DB Prisoner Inbox/Civil Rights/ S/gome1592.msj fr